1

2

3

4

5

6

7

8                           UNITED STATES  DISTRICT COURT

9                             Northern District of California

10                                  San Francisco Division

11   JORDAN BRANSCUM,                          No. C 11-04137 LB

12                  Plaintiff,                 **ORDER DENYING CROSS-MOTIONS**
                                               **FOR SUMMARY JUDGMENT**
13        v.
                                               [Re: ECF Nos. 42, 51]
14   SAN RAMON POLICE DEPARTMENT, et
     al.,
15
                  Defendants.
16   _____/

17                                    **INTRODUCTION**

18        In this civil rights action alleging claims under 28 U.S.C. § 1343 and 42 U.S.C. §§ 1981, 1983,

19   1985, 1988, Plaintiff Jordan Branscum asserts that five officers of the San Ramon Police Department

20   ("SRPD") used excessive force when they restrained and arrested him.  *See* First Amended

21   Complaint, ECF No. 10 at 3-5, ¶¶ 11-19.[1]  He also asserts that the City of San Ramon ("City") and

22   Scott Holder, the Chief of the San Ramon Police Department, are liable under federal law for the

23   officers' acts.  *Id*. at 5-8, ¶¶ 20-33.

24        Defendants—the SRPD, the City, Chief Holder, and five SRPD officers (Officer Jonathan

25   Stephens, Officer Jason Nunn, Sergeant T.J. Reeder, Corporal Paul Burke, and Officer Stanley Szeto

26   (collectively, "Officer Defendants"))—move for summary judgment, arguing that: (1) the force used

27   _____

28        [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page
     number at the top of the document, not the pages at the bottom.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1    against Mr. Branscum was objectively reasonable; (2) even if it was not, the Officer Defendants are

2    entitled to qualified immunity; and (3) the City and Chief Holder are not liable for the Officer

3    Defendants' acts. Defendants' Motion, ECF No. 42.[2]  Mr. Branscum opposes Defendant's motion

4    and ostensibly cross-moves for summary judgment. Plaintiff's Opposition and Cross-Motion, ECF

5    No. 51. Defendants oppose Mr. Branscum's motion. Reply, ECF No. 52. The court heard one hour

6    of oral argument from the parties on December 20, 2012. 12/20/2012 Minute Order, ECF No. 55.

7         Upon review of the record before the court and consideration of the parties' arguments and the

8    applicable legal authority, the court **DENIES** Defendants' and Mr. Branscum's motions for

9    summary judgment.

10    **STATEMENT**[3]

11    **I. THE POLICE CHASE**

12         At approximately 2:00 a.m. on May 9, 2009, Officer Michael Benz of the San Leandro Police

13    Department ("SLPD"), who was dressed in full uniform, was assisting other officers with a battery

14    investigation at the Lakeside Lounge at 15293 Hesperian Boulevard in San Leandro, California.

15    Blechman Declaration, ECF No. 48, Ex. A (transcript of the June 23, 2009 preliminary examination

16    in *People v. Jordan E. Branscum*) at 3.[4]  He was standing outside in front of the lounge when he

17

18         [2] Defendants note that Officer Nunn was erroneously sued as "Joseph Nunn." Defendant's

19    Motion, ECF No. 42 at 6 n.1.

20         [3] The court summarizes only the various facts (both undisputed and disputed) that the court

21    deems necessary for purposes of this order. The court acknowledges that the parties provided
additional facts through declarations that accompany their moving papers, and the court is not

22    suggesting that these additional facts are irrelevant to this action as a whole.

23         [4] Defendants request that the court take judicial notice of the following four documents: (1)

24    pages 1-15 (the testimony of Officer Michael Benz) of the transcript of the June 23, 2009
preliminary examination in *People v. Jordan E. Branscum*; (2) pages 1-21 of the transcript of July

25    22, 2011 felony plea in *People v. Jordan E. Branscum*; (3) the criminal information dated June 26,
2009 in *People v. Jordan E. Branscum*; and (4) and Mr. Branscum's First Amended Complaint in

26    the instant action. Defendants' Request for Judicial Notice ("RJN"), ECF No. 44 at 1-2; *see*

27    Blechman Declaration, ECF No. 48, Exs. A, B, EE, FF.

28         Under Federal Rule of Evidence 201, "[t]he court may judicially notice a fact that is not
subject to reasonable dispute because it: (1) is generally known within the trial court's territorial

saw Mr. Branscum walk out of the lounge and get into a brown van. *Id*. Mr. Branscum backed up the van and collided into Officer Benz's unoccupied marked patrol car. *Id*. at 4. Officer Benz then ran over to make sure that Mr. Branscum understood that he was to stop due to the collision. *Id*. at 5. Officer Benz was shouting and moving his arms, and he got in front of the van to make sure that he and Mr. Branscum saw each other. *Id*. The van continued to back into his patrol car, and then it broke free and jerked forward, forcing Officer Benz to jump out of the way. *Id*. Officer Benz made eye contact with Mr. Branscum at that moment. *Id*. at 5-6.

Officer Liaquat Khan, also of SLPD, was nearby during these events. *Id*. at 6.[5] Officer Khan had his gun drawn and pointed at Mr. Branscum, and he was yelling for Mr. Branscum to stop his van. *Id*. at 6-7. The engine of the van revved up several times, and then Mr. Branscum started to drive directly toward Officer Khan, despite there being several open lanes of travel to the left of him. *Id*. at 7. Officer Khan had to move to his left, and the van missed him by only a few feet. *Id*. at 7-8.

_____

jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). A "high degree of indisputability is the essential prerequisite" to taking judicial notice and "the tradition [of taking judicial notice] has been one of caution in requiring that the matter be beyond reasonable controversy." Fed. R. Evid. 201(a) & (b) advisory committee's notes (emphasis added). A court, then, may take judicial notice of undisputed facts contained in public records, but it may not take judicial notice of disputed ones. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001); *see also Muhammad v. California*, C-10-1449-SBA, 2011 WL 873151, at *4 (N.D. Cal. Mar. 11, 2011) (denying request for judicial notice of an address contained on a complaint filed in another case because the "underlying facts relevant to Plaintiff's residence are disputed and otherwise do not meet the requirements of Rule 201").

These four documents all are public records, and Mr. Branscum did not file an opposition to Defendants' request for judicial notice or otherwise dispute the facts contained in the documents. (Mr. Branscum does object to the relevance of the first two documents to the merits of this action, but the court need not reach his objections now because the court denies Defendants' motion and does not need to consider the documents to do so. *See* Branscum's Objection, ECF No. 51-1 at 1-2.) Thus, the court will take judicial notice of these four documents and the undisputed facts contained in them.

[5] The court notes that Ex. A to the Blechman Declaration (the transcript of the June 23, 2009 preliminary examination in *People v. Jordan E. Branscum*) states that the officer's last name is "Kwan," but Ex. EE to the Blechman Declaration (the criminal information dated June 26, 2009 in *People v. Jordan E. Branscum*) states that his last name is "Khan." Defendants' motion also states that his last name is "Khan." Thus, the court will use the last name of "Khan" in this order.

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1    Mr. Branscum then exited the parking lot and drove southbound on Hesperian Boulevard at a speed

2    of approximately 50-60 mph (despite being in a 35-mph zone). *Id*. at 8.

3       Officer Benz and Officer Khan got into their patrol cars, activated their lights and sirens, and

4    pursued Mr. Branscum. *Id*. Mr. Branscum took the on-ramp for southbound Highway 238. *Id*. The

5    van's headlights turned off and he was driving at a speed of approximately 60-90 mph. *Id*. at 8-10.

6    He then took eastbound Interstate 580. *Id*. at 10. From there, Mr. Branscum next made a quick exit,

7    from the wrong lane, onto Center St. in Castro Valley, California. *Id*. at 11. He was still driving at a

8    high rate of speed. *Id*. The van skidded into a center median, and the collision caused the van's left

9    front tire to blow-out completely. *Id*. Mr. Branscum stopped briefly, but he then continued to flee

10   while debris and sparks were coming off the rim of the van's front wheel. *Id*. Mr. Branscum ran a

11   red light and then turned right onto eastbound Crow Canyon Road. *Id*. at 12. He continued to drive

12   at a high rate of speed, ran more red lights and, at one point, veered into oncoming traffic while the

13   van's headlights were off. *Id*. at 12-13. When the van went into the wrong lane, Officer Benz

14   backed off of the pursuit. *Id*. at 13. The van eventually went back into a normal traffic lane and

15   continued speeding through a winding section of Crow Canyon Road. *Id*.

16      The Office Defendants, who, again, are members of the SRPD, not the SLPD, had been

17   monitoring the ongoing vehicle pursuit of Mr. Branscum, who was reported to have used his van as

18   a deadly weapon towards a SLPD officer. Joint Statement of Undisputed Facts ("JSUF") 3, ECF

19   No. 46 at 2. They were staged nearby, and they took over the pursuit once Mr. Branscum entered

20   San Ramon, California. JSUF 1, ECF No. 46 at 2. Officer Nunn became the lead pursuing officer.

21   JSUF No. 8, ECF No. 46 at 3. Sergeant Reeder supervised the pursuit. *Id*. All of the Officer

22   Defendants were wearing their SRPD-issued police uniforms and were driving their marked patrol

23   vehicles. *Id*.

24      The Officer Defendants went toward the location of the fleeing van and observed it being

25   pursued by several police vehicles. JSUF 7, ECF No. 46 at 3. Mr. Branscum was driving

26   dangerously and appeared to have a total disregard for the safety of other drivers and/or members of

27   the public. *Id*. At one point, Corporal Burke observed Mr. Branscum driving in the eastbound

28   direction of westbound Crow Canyon Road while he was traveling westbound on that same

1   roadway.  JSUF No. 9, ECF No. 46 at 3.  Corporal Burke had to swerve away from Mr. Branscum's

2   approaching van, to avoid a head-on collision.  *Id.*

3        Mr. Branscum drove on the wrong side of the road or between two lanes.  JSUF No. 10, ECF

4   No. 46 at 3.  Also, the van did not have its headlights turned on, and debris was flying off of it.  *Id.*

5   Due to the danger of the situation, Sergeant Reeder terminated the pursuit, though officers were

6   ordered to "maintain a visual" on the van.  JSUF No. 11, ECF No. 46 at 4.  Corporal Burke and

7   Officer Szeto tried to set up spike strips to try to end the pursuit, but they were unable to do so

8   because of Mr. Branscum's driving.  JSUF No. 12, ECF No. 46 at 4.  Before Corporal Burke could

9   set up his spike strip, he saw Mr. Branscum driving eastbound at him in the westbound lanes so he

10   drew his firearm and pointed it at Mr. Branscum in case the van drove toward him.  JSUF No. 13,

11   ECF No. 46 at 4.  It did not, as Mr. Branscum turned left onto westbound Camino Tassajara.  *Id.*

12   Corporal Burke got back into his police vehicle and followed the pursuit.  *Id.*  Eventually, Mr.

13   Branscum again drove on the correct side of the road, so the Officer Defendants re-established their

14   pursuit of him.  JSUF No. 14, ECF No. 46 at 4.  Officer Nunn was the primary unit in pursuit,

15   Sergeant Reeder was the second unit, and Officer Stephens was the third unit.  *Id.*  Officer Szeto

16   followed the other officers who were in pursuit.  *Id.*

17        Finally, Mr. Branscum attempted to turn right from Camino Tassajara Road onto northbound Old

18   Blackhawk Road.  JSUF No. 15, ECF No. 46 at 4.  The van collided with a street sign on the

19   northwest sidewalk area of that intersection and rolled to a stop.  *Id.*  In total, the pursuit time was

20   approximately 18 minutes over a distance of 23 miles.  *See* Blechman Declaration, Ex. A at 15.

21   **II.  THE OFFICER DEFENDANTS' RESTRAINT AND ARREST OF MR. BRANSCUM**

22        Mr. Branscum's and Defendants' accounts of what happened after the van came to a stop differ

23   significantly.

24       **A.  Defendants' Account**

25        According to the Officer Defendants, when they saw that the van had come to a stop, they

26   stopped their vehicles and prepared to take Mr. Branscum into custody.  JSUF No. 16, ECF No. 46

27   at 4.  They considered it a high-risk traffic stop, and it was reported by Officer Nunn as a felony

28   stop.  *Id.*  Officer Stephens stopped his police vehicle at the scene, exited the vehicle, and, with his

1   firearm drawn, went around the front of the disabled van while pointing his firearm in that direction

2   to attempt to take Mr. Branscum into custody and/or confront any potential threats in relation to the

3   van. JSUF No. 17, ECF No. 46 at 4. Sergeant Reeder, Corporal Burke, Officer Nunn, and Officer

4   Szeto also stopped at the scene and existed their vehicles, and approached the van with their guns

5   drawn, to assist with these tasks. JSUF Nos. 18-21, ECF No. 46 at 5.

6       The Officer Defendants did not know if there were any other persons in the van because they

7   could only see a portion of the front two seats of it. JSUF No. 23, ECF No. 5. Thus, they

8   considered the van to be a significant threat to their safety, at least until it could be "cleared." *Id*.

9   Also, there was a considerable amount of smoke in the area, which appeared to be coming from the

10  van's still-spinning wheels and tires (although the van seemed to be inoperable). JSUF No. 22, ECF

11  No. 5. At first, the smoke affected the Officers Defendants' ability to see all areas in the vicinity.

12  *Id*.

13      As Officer Nunn was moving towards the van (his view of which was partially obscured by the

14  dissipating smoke), he heard a noise that sounded like a squeaky door, so he assumed that Mr.

15  Branscum was exiting the vehicle. JSUF No. 24, ECF No. 46 at 5-6. As Officer Nunn continued his

16  slow, tactical approach towards the van, he immediately ordered Mr. Branscum to get on the ground. *Id*.

17  Officer Nunn saw Mr. Branscum get on his stomach on the ground. JSUF No. 25, ECF No. 46 at 6.

18  Officer Nunn then temporarily stopped his tactical approach but he continued to cover Mr.

19  Branscum with his firearm. *Id*. Officer Nunn continued to divide his attention between Mr.

20  Branscum and the "uncleared" van. *Id*. Officer Nunn then continued his approach toward Mr.

21  Branscum. JSUF No. 26, ECF No. 46 at 6. Mr. Branscum was prone on the ground, and it appeared

22  to Officer Nunn that he was going to be submitting to arrest. *Id*. Officer Nunn then saw Officer

23  Stephens approach Mr. Branscum from behind, and he believed that Officer Stephens was going to

24  attempt to take Mr. Branscum into custody. *Id*. Officer Nunn then focused his attention on the

25  "uncleared" van. *Id*.

26      Officer Stephens, who was moving around the front of the van, had heard officers command Mr.

27  Branscum to get on the ground. JSUF No. 27, ECF No. 46 at 6. Officer Stephens saw Mr.

28  Branscum exit the driver's side of the vehicle and get on his stomach, in the prone position, on the

UNITED STATES DISTRICT COURT
For the Northern District of California

ground. *Id.* Mr. Branscum's head and face were away from Officer Stephens. *Id.* Smoke was still in the area, but it seemed to be dissipating. *Id.* The Officer Defendants were fearful because they did not know if Mr. Branscum was armed, if he was trying to formulate a plan of attack, or if he might try to continue to flee on foot and into the nearby populated residential neighborhoods. Blechman Declaration, ECF No. 48, Exs. C (Stephens Declaration), ¶ 19; E (Nunn Declaration), ¶ 24; I (Reeder Declaration), ¶ 25; N (Burke Declaration), ¶ 26; Q (Szeto Declaration), ¶ 24. Based upon their training and experience, and per the threatening situation, the Officer Defendants believed that time was of the essence to get Mr. Branscum into handcuffs "to end his crime spree" and his "threatening, dangerous behavior towards officers and the public." *Id.*, Exs. C, ¶ 20; E, ¶ 25; I, ¶ 26; N, ¶ 27; Q, ¶ 25.

Approaching Mr. Branscum from behind, Officer Stephens holstered his firearm and tried to take him into custody quickly. JSUF No. 28, ECF No. 46 at 6. Mr. Branscum was on his stomach, his head was off the ground and his hands were out in front of him, and it appeared as if he was going to allow himself to be handcuffed. Blechman Declaration, ECF No. 48, Ex. C, ¶ 21. Officer Stephens then approached from the rear and the right side of Mr. Branscum, and bent down and put his hands on Mr. Branscum's upper back/lower neck to push him down and keep his body down to maintain control and limit any safety threat. *Id.*, Ex. C, ¶ 22. Mr. Branscum's hands then changed positions and went closer to his head. *Id.* Officer Stephens attempted to grab Mr. Branscum's right wrist with his right hand for handcuffing. *Id.*, Ex. C, ¶ 23. As he tried to get Mr. Branscum's right hand under control, Mr. Branscum yanked his right arm away and moved both of his hands away from Officer Stephens and under his body, towards his "waistband area." *Id.* This was a significant officer safety concern as the Officer Defendants did not know what Mr. Branscum was reaching for, as Mr. Branscum had not been searched for weapons and suspects often have weapons hidden in their waistband areas. *Id.* Mr. Branscum also started to roll his body away from the officer in an attempt to either flee, mount an attack, or get off the ground. *Id.*, Ex. C, ¶ 24. Officer Stephens tried to maintain some contact with the Mr. Branscum's body or clothing to keep him on the ground, but Mr. Branscum's was able to get onto his knees. *Id.*, Ex. C, ¶¶ 25-26. Officer Stephens then tackled Mr. Branscum back to the ground, moving them both closer towards the van. *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Officer Stephens continued to wrestle with Mr. Branscum on the ground by the van, and Mr.

2   Branscum continued to resist Officer Stephens's efforts to get him onto his stomach and give up his

3   hands.  *Id.*, Ex. C, ¶ 27.  Officer Stephens tried to wrap his arms and legs around Mr. Branscum's

4   body to get him under control.  *Id.*  At some point, Officer Stephens became somewhat wedged

5   underneath the side of the van.  *Id.*  Despite these efforts, Mr. Branscum was still able to thrash out

6   of Officer Stephens's grasp.  *Id.*

7   Sergeant Reeder, Corporal Burke, and Officer Nunn saw Officer Stephens struggling to control

8   Mr. Branscum, and they came to Officer Stephens's aid.  *Id.*, Exs. C, ¶ 28; I, ¶¶ 24, 27; N ¶¶ 24-25;

9   E, ¶¶ 31-32.  Officer Nunn attempted to gain control of one of Mr. Branscum's hands, but Mr.

10  Branscum pulled it away and tucked both of his hands by his waistband area.  *Id.*, Ex. E, ¶ 33.

11  Officer Nunn then holstered his weapon, put his flashlight down, and gave two "distraction strikes"

12  to the left side of Mr. Branscum's face to get him to stop fighting and submit to arrest.  *Id.*, Ex. E, ¶

13  34.  Due to the significant movement of the struggle and close proximity of Officer Stephens, the

14  distraction strikes were the most viable force option for Officer Nunn to try to end this violent

15  struggle.  *Id.*, Ex. E, ¶ 35.  The distraction strikes, however, were ineffective, and Mr. Branscum still

16  violently resisted.  *Id.*, Ex. E, ¶ 36.  Officer Nunn, as well as Sergeant Reeder, then attempted to grab

17  Mr. Branscum's uncontrolled hands and arms, but those efforts also were ineffective.  *Id.*, Exs. E, ¶

18  37; I, ¶ 28.

19  Corporal Burke holstered his firearm, and he too attempted to grab Mr. Branscum's left arm, but

20  Mr. Branscum continually twisted it, causing Corporal Burke to lose his grip.  *Id.*, Ex. N, ¶ 29.

21  Fearing that Mr. Branscum might try to access a weapon, Corporal Burke deployed one distraction

22  strike to Mr. Branscum's right side of his face with a closed fist to try to quickly end the struggle,

23  but it had no effect.  *Id.*, Ex. N, ¶¶ 31-33.  Further, as Officer Szeto's hands were occupied with a

24  shotgun, he briefly attempted to use his left leg to apply pressure to Mr. Branscum's upper back to

25  assist in restraining him.  JSUF 29, ECF No. 46 at 6-7.  (This was the only time that Officer Szeto

26  had physical contact with the Mr. Branscum.  *Id.*)

27  During this struggle, the Defendant Officers verbally commanded Mr. Branscum to comply, but

28  he did not.  Blechman Declaration, ECF No. 48, Exs. E ¶ 39, I ¶ 29; N ¶ 35; Q ¶ 30.  Sgt. Reeder

1   ordered Mr. Branscum to "stop fighting." *Id.*, Ex. I, ¶ 29.  Mr. Branscum continued to move his

2   body to prevent the officers from getting him or his arms under control so they could be handcuffed.

3   *Id.*, Exs. C ¶ 29; E ¶¶ 40-41; I ¶ 31; N ¶ 36; Q ¶ 32.  Officer Stephens eventually was able to get off

4   the ground and to better position himself to assist in taking Mr. Branscum into custody.  JSUF 30,

5   ECF No. 46 at 7.  As Officer Szeto could not use his hands because he was holding a shotgun,

6   Officer Stephens took Officer Szeto's position and continued to try to gain control of Mr. Branscum.

7   Blechman Declaration, ECF No. 48, Ex. Q, ¶ 28.

8       Due to the nature of the criminal charges and Mr. Branscum's resistance, Sergeant Reeder "drive

9   stunned" ("contact tased") Mr. Branscum two times on his lower body.  *Id.*, Ex I, ¶ 32.[6]  Before

10  Sergeant Reeder used the taser, he gave a very loud warning several times, stating "I got taser."  *Id.*

11  The drive stuns appeared to have no effect.  *Id.*, Ex. I, ¶ 37.

12      The Officer Defendants continued their efforts to try to gain control of Mr. Branscum, who

13  continuing to thrash, pull his arms away, roll, and kick to keep from being controlled.  *Id.*, Exs. I ,¶

14  36; N ,¶ 38.  Officer Nunn then announced that he was going to deploy his taser in the "probe" mode

15  ("projectile darts").  *Id.*, Ex. E, ¶ 42.  The Officer Defendants moved away from Mr. Branscum to

16  give Officer Nunn room to do so.  *Id.*, Ex., I, ¶ 38.  Officer Nunn then shot the taser probes into Mr.

17  Branscum's back.  *Id.*, Exs. E, ¶ 42; I, ¶ 38.  Officer Nunn held down the taser's trigger for 12

18  seconds due to Mr. Branscum's continued resistance.  *Id*.  While the taser probe deployment is

19  supposed to cause an involuntary neuromuscular incapacitation of major muscle groups (so that an

20  individual can be controlled), the deployment here seemed to have little or no effect on Mr.

21  Branscum (even during the 12 second during the deployment).  *Id.*, Exs. E, ¶ 43; I, ¶ 39.

22      The Officer Defendants continued their efforts, and eventually they were able to get and keep

23  Mr. Branscum on his stomach, secure his hands, and handcuff him.  *Id.*, Exs. C ¶ 31; E, ¶¶ 45-46; I,

24  ¶ 40; N, ¶¶ 38, 40; Q, ¶¶ 33, 35.  The entire struggle had lasted approximately 80-81 seconds.  *Id.*,

25  Exs. C, ¶ 32; E, ¶ 48; I, ¶ 41; N, ¶ 41; Q, ¶ 36.  Once Mr. Branscum was handcuffed, the officers

26

27  ───────────────

28      [6] A drive stun (contact tase) is a localized, pain compliance technique.  JSUF 31, ECF No. 46
    at 7.  Per Sergeant Reeder's training and experience, a drive stun does not lead to involuntary
    neuromuscular incapacitation like use in the probe mode (projectile darts).  *Id*.

retreated, cleared

the van of threats, and medical staff was called to the scene.  JSUF 35-36, ECF No. 46 at 7.  Officer

Nunn remained close to Mr. Branscum, with his taser in the "ready" position and with the taser

probes still attached to Mr. Branscum, in case he continued to resist.  Blechman Declaration, ECF

No. 48, Ex. E, ¶ 50.

**B.  Mr. Branscum's Account**

Mr. Branscum's account of the events, to the extent he recalls them, is different.[7]  He was

interviewed on May 10 and 11, 2009—one and two days after his arrest, respectively—about the

events by Sergeant Robert McManus of the SLPD.  JSUF 65, ECF No. 46 at 14.  On May 10, 2009,

Mr. Branscum stated that he did not "remember details" and did not "remember a whole lot."  JSUF

No. 68, ECF No. 46 at 15.  The next day, Mr. Branscum still did not remember many of the events.

However, he did state, with respect to his arrest, that after he went to the ground, he remembered the

use of a taser, "and that's kind of all I really remember."  JSUF 85, ECF No. 46 at 17.  He also stated

that he remembered officers telling him to "stop resisting, stop resisting" and that officers still

insisted he was resisting and "were tasing me."  *Id*.  Mr. Branscum stated that he did not remember

struggling with one of the officers.  JSUF No. 86, ECF No. 46 at 17.  And when asked if he would

be surprised to learn that he did struggle, he stated, "Yeah, it would, because I remember specifically

going straight down to the ground, seems like, on my own."  *Id*.

Similarly, during his deposition on February 9, 2012, Mr. Branscum testified that he remembers

being commanded more than once to get on the ground, and after hearing those commands, he did so

instantly.  Lagos Declaration, ECF No. 51-3, Ex. P (Branscum Deposition) at 127:16-128:5; 129:6-

8.  The next thing that Mr. Branscum remembers is being hit on the side of his face and turning his

face to avoid it the blows.  *Id*. at 129:20-130:5.  Mr. Branscum does not recall any other command

being given by any officer, after he was commanded to "get on the ground."  *Id*. at 146:4-147:3.

**C.  Other Evidence concerning the Restraint and Arrest of Mr. Branscum**

---

[7] Mr. Branscum does not remember many details about the events because he blacked out for periods of time between his leaving the Lakeside Lounge and his being at the hospital after his arrest.  JSUF No. 88-89, ECF No. 46 at 17.

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Numerous video recordings exist that show portions of the events described above.  Defendants

2   submitted videos taken from the cameras mounted on the dashboards of the vehicles driven by

3   Sergeant Reeder, Corporal Burke, Officer Nunn, and Officer Szeto as well as videos taken from the

4   cameras mounted on the tasers used by Sergeant Reeder and Officer Nunn.  *See* Blechman

5   Declaration, ECF No. 48, Exs. G, H, K, L, P, S.  Photographs of the scene also were submitted.  *See*

6   *id.*, Ex. M.  In addition, other law enforcement officers, who are not parties to this action, provided

7   deposition testimony or submitted declarations that generally support the Officer Defendants'

8   account of their restraint and arrest of Mr. Branscum.  *See id.*, Exs. T (Love Deposition), U (Briggs

9   Declaration), V (Sosa Declaration), W (Neu Declaration).

## III.  THE SRPD'S RESPONSE

11  Chief Holder, who is the ultimate policy-maker for the SRPD, stated in his deposition that he

12  found out about Mr. Branscum's arrest on the morning of May 9, 2009.  Lagos Declaration, ECF

13  No. 51-3, Ex. I (Chief Holder Deposition) at  9:6-19, 17:15-22.  He later signed off on the use of

14  force used against Mr. Branscum after reviewing the video and reading the incident report.  *Id.*, Ex. I

15  at 25:9-27:2.  He believes that Mr. Branscum was resisting, but he could not tell from the video

16  whether Mr. Branscum was trying to escape or just not complying.  *Id.*, Ex. I at 30:18-25, 31:2-4.

17  He concluded that Mr. Branscum refused commands, tried to get up from the ground, tried to go

18  underneath the van, and struggled with the officers.  *Id.*, Ex. I at 31:5-16.

19  In addition, the videos, or portions of them, subsequently have been used by the SRPD to train

20  its officers how to properly handle situations such as the one at issue here.  *Id.*, Ex. N (Stevens

21  Deposition) at 31:17-34:12.

## IV.  THE FEDERAL ACTION

23  On August 23, 2011, Mr. Branscum filed a complaint against Defendants in federal court.

24  Original Complaint, ECF No. 1.  On September 15, 2012, he filed a First Amended Complaint.  First

25  Amended Complaint ("FAC"), ECF No. 10.  In it, Mr. Branscum brings four claims for relief.  His

26  first claim, brought against the Officer Defendants only, is for violation of 28 U.S.C. § 1343 and 42

27  U.S.C. § 1981, 1983, 1985, and 1988.  FAC, ECF No. 10 at 5.  His second claim, brought against the

28  City only, is for violation of 42 U.S.C. § 1983 and based on *Monell v. Department of Social*

1   *Services*, 463 U.S. 658 (1978).  FAC, ECF No. 10 at 5-7.  His third claim, brought against the City

2   and Chief Holder only, also is for violation of 42 U.S.C. § 1983 and based on *Monell*.  FAC, ECF

3   No. 10 at 7-8.  And his fourth claim, brought against the Officer Defendants only, is for

4   "conspiracy."  FAC, ECF No. 10 at 8-9.  Defendants answered the First Amended Complaint on

5   October 3, 2012.  Answer, ECF No. 11.

6       Now, Defendants move for summary judgment.  Defendants' Motion, ECF No. 42.  Mr.

7   Branscum opposes Defendant's motion and ostensibly cross-moves for summary judgment.

8   Plaintiff's Opposition and Cross-Motion, ECF No. 51.  Defendants oppose Mr. Branscum's motion.

9   Reply, ECF No. 52.  The court heard one hour of oral argument from the parties on December 20,

10   2012.  12/20/2012 Minute Order, ECF No. 55.

11   **ANALYSIS**

12   **I.  CLARIFYING MR. BRANSCUM'S CLAIMS**

13       In his First Amended Complaint, Mr. Branscum brings four claims for relief.  His first claim,

14   brought against the Officer Defendants only, is for violation of 28 U.S.C. § 1343 and 42 U.S.C. §§

15   1981, 1983, 1985, and 1988.  FAC, ECF No. 10 at 5.  A review of the statutes and Mr. Branscum's

16   complaint, however, makes clear that not all of the statutes cited are necessary or supported.  First,

17   28 U.S.C. § 1343 provides for federal jurisdiction, not a claim for relief.  Second, 42 U.S.C. § 1988

18   allows parties to seek attorney's fees in civil rights cases but also does not provide a claim for

19   relief.[8]  Third, violation of 42 U.S.C. § 1981 can be the basis of a claim for relief, but neither side

20   has addressed it, and the court does not see how it applies to these facts.[9]  At oral argument, Mr.

21   _____

22       [8] In a federal civil rights action, a "court, in its discretion, may allow the prevailing party,
    other than the United States, a reasonable attorney's fee."  42 U.S.C. § 1988(b).  A party is

23   considered the prevailing party if it succeeds "on any significant issue in litigation which achieves

24   some of the benefit the parties sought in bringing suit."  *Thorne v. City of El Segundo*, 802 F.2d
    1131, 1140 (9th Cir. 1986).  While a party need not prevail on all issues, it must show "a sufficient

25   causal relationship between the lawsuit and the practical outcome realized by the suit."  *Herrington*

26   *v. Cnty. of Sonoma*, 883 F.2d 739, 744 (9th Cir. 1989).

27       [9] "Section 1981 of the Civil Rights Act of 1866 provides that '[a]ll persons within the
    jurisdiction of the United States shall have the same right in every State and Territory to make and

28   enforce contracts . . . as is enjoyed by white citizens.'"  *Johnson v. Lucent Technologies Inc.*, 653
    F.3d 1000, 1005-08 (9th Cir. 2011) (quoting 42 U.S.C. § 1981(a)).

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Branscum conceded that § 1981 did not apply.  Fourth, violation of 42 U.S.C. § 1985, which

2   addresses conspiracies to violate civil rights, also can be the basis of a claim for relief, but Mr.

3   Branscum has agreed to forego his conspiracy allegations.  *See* Defendant's Motion, ECF No. 42 at

4   8 n.3.[10]  At oral argument, Mr. Branscum confirmed this agreement.  This leaves the first claim as

5   one brought under 42 U.S.C. § 1983 for violation of Mr. Branscum's Fourth Amendment right to be

6   free from unreasonable searches and seizures, which is what this case is primarily about.[11]

7       Mr. Branscum's second claim, brought against the City only, is for violation of 42 U.S.C. § 1983

8   and based on *Monell v. Department of Social Services*, 463 U.S. 658 (1978).  FAC, ECF No. 10 at 5-

9   7.  His third claim, brought against the City and Chief Holder only and also for violation of 42

10  U.S.C. § 1983 and based on *Monell*, appears to cover the same conduct as that covered by the

11  second claim.  *See* FAC, ECF No. 10 at 7-8.  The second claim seeks injunctive and declaratory

12  relief, but these, of course, are remedies, not claims.  At oral argument, Mr. Branscum stated that

13  there is no reason for having two *Monell* claims.  Thus, the court considers Mr. Branscum's second

14  and third claims to be a single *Monell* claim.

15      Finally, Mr. Branscum's fourth claim, brought against the Officer Defendants only, is for

16  "conspiracy."  FAC, ECF No. 10 at 8-9.  It is not clear whether Mr. Branscum brings this claim

17

18

19
_____

20      [10] To state a claim under 42 U.S.C. § 1985 for a conspiracy to violate civil rights, a plaintiff
    must plead four elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or

21  indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges
    and immunities under the laws; and (3) an act in furtherance of this conspiracy; (4) whereby a

22  person is either injured in his person or property or deprived of any right or privilege of a citizen of
    the United States."  *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992).

23

24      [11] Title 42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges,
    or immunities secured by the Constitution or laws of the United States" by any person acting "under

25  color of any statute, ordinance, regulation, custom, or usage."  *Gomez v. Toledo*, 446 U.S. 635, 639

26  (1980).  Section 1983 is not itself a source for substantive rights, but rather a method for vindicating
    federal rights elsewhere conferred.  *See Graham v. Connor*, 490 U.S. 386, 393–394 (1989).  To state

27  a claim under § 1983, a plaintiff must allege: (1) the conduct complained of was committed by a
    person acting under color of state law; and (2) the conduct violated a right secured by the

28  Constitution or laws of the United States.  *See West v. Atkins*, 487 U.S. 42, 48 (1988).

UNITED STATES DISTRICT COURT
For the Northern District of California

1  under California common law or 42 U.S.C. § 1985.  *See id.*[12]  As noted above, Mr. Branscum has

2  agreed to forego his conspiracy allegations.  *See* Defendant's Motion, ECF No. 42 at 8 n.3.

3      With Mr. Branscum's claims cleared up, the court considers the parties' summary judgment

4  motions with respect to Mr. Branscum's claim under § 1983 and his claim under *Monell*.

## II.  THE SUMMARY JUDGMENT STANDARD

6      A motion for summary judgment should be granted if there is no genuine issue of material fact

7  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Anderson v.*

8  *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Material facts are those that may affect the

9  outcome of the case.  *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine if there

10  is sufficient evidence for a reasonable jury to return a verdict for the non-moving party.  *Id.* at 248-

11  49.

12      The party moving for summary judgment bears the initial burden of informing the court of the

13  basis for the motion, and identifying portions of the pleadings, depositions, answers to

14  interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material

15  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the moving party

16  must either produce evidence negating an essential element of the nonmoving party's claim or

17  defense or show that the nonmoving party does not have enough evidence of an essential element to

18  carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*

19  *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076

20  (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need

21  only point out 'that there is an absence of evidence to support the nonmoving party's case.'")

22  (quoting *Celotex Corp.*, 477 U.S. at 325).

23      If the moving party meets its initial burden, the burden shifts to the non-moving party to produce

24  evidence supporting its claims or defenses.  *Nissan Fire & Marine Ins. Co., Ltd.*, 210 F.3d at 1103.

25  _____

26      [12] The elements of a civil conspiracy are "(1) the formation and operation of the conspiracy;

27  (2) the wrongful act or acts done pursuant thereto; and (3) the damage resulting."  *Mosier v. S. Cal. Physicians Ins. Exch.*, 63 Cal. App. 4th 1022, 1048 (Cal. App. 1998) (citing *Doctors' Co. v.*

28  *Superior Court* 49 Cal. 3d 39, 44 (1989); *Unruh v. Truck Insurance Exchange*, 7 Cal. 3d 616, 631 (1972)).

1   The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence,

2   but instead must produce admissible evidence that shows there is a genuine issue of material fact for

3   trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show

4   a genuine issue of material fact, the moving party is entitled to summary judgment. *See Celotex*, 477

5   U.S. at 323.

6       In ruling on a motion for summary judgment, inferences drawn from the underlying facts are

7   viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith*

8   *Radio Corp.*, 475 U.S. 574, 587 (1986).

9   **III.  MR. BRANSCUM'S CLAIM UNDER 42 U.S.C. § 1983 FOR VIOLATIONS OF HIS**

10  **FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES**

11  **AND SEIZURES**

12      The Fourth Amendment to the United States Constitution protects persons against "unreasonable

13  searches and seizures." U.S. Const. amend. IV. It is undisputed that Mr. Branscum was "seized"

14  within the meaning of the Fourth Amendment. Thus, the issue before the court is whether the force

15  used during his seizure was "objectively reasonable" or not. *Arpin v. Santa Clara Valley Transp.*

16  *Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

17      "Determining whether the force used to effect a particular seizure is reasonable under the Fourth

18  Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's

19  Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*,

20  490 U.S. at 396 (internal citations and quotations omitted). To do so, a court must evaluate the facts

21  and circumstances of each particular case, including (1) the severity of the crime at issue, (2)

22  whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether

23  he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396

24  (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). The most important of these three factors is

25  whether the suspect poses an immediate threat to the safety of the officers or others. *Id.* "In some

26  cases . . . the availability of alternative methods of capturing or subduing a suspect [also] may be a

27  factor to consider." *Smith v. City of Hemet*, 349 F.3d 689, 701 (9th Cir. 1994).

28      "The reasonableness of a particular use of force must be judged from the perspective of a

UNITED STATES DISTRICT COURT
For the Northern District of California

1   reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S.

2   at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)); *see id.* at 396-97 ("'Not every push

3   or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the

4   Fourth Amendment.") (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). This is

5   because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are

6   often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

7   evolving—about the amount of force that is necessary in a particular situation." *Id.*

8       As the court described above, the two sides have dramatically different accounts of Mr.

9   Branscum's restraint and arrest. On one hand, Defendants provide admissible evidence showing that

10  Mr. Branscum exited the van and got on the ground but, if the Officer Defendants are believed, he

11  began resisting once Officer Stephens tried to handcuff him. They also provide admissible evidence

12  showing that Mr. Branscum continued to resist, despite the Officer Defendants' verbal commands

13  and escalating efforts to subdue him. On the other hand, Mr. Branscum provides admissible

14  evidence that he got on the ground and obeyed all of the Officer Defendants' commands. While he

15  does not remember anything from the time he had his head down to when he was being hit by

16  Officer Nunn, the video evidence could suggest, as Mr. Branscum argues, that Officer Stephens

17  lifted Mr. Branscum off the ground from his prone position and thereby initiated the struggle. This

18  factual dispute over who started the struggle (i.e., whether Mr. Branscum lifted up and started

19  resisting or whether Officer Stephens pulled Mr. Branscum up even though Mr. Branscum was

20  submitting to arrest) is the heart of the case, and it obviously is material. To even begin to decide

21  whether the amount of force used was reasonable, the issue of whether, and to what extent, Mr.

22  Branscum resisted being arrested must be decided.

23      It also is a genuine dispute. It is true that there is more admissible evidence supporting

24  Defendants' account (e.g., the testimony of the Officer Defendants as well as other non-party

25  officers who were at the scene) than that supporting Mr. Branscum's account, but this disparity

26  alone is not enough to support entry to summary judgment. Both sides believe that the video

27  evidence clearly supports their accounts of what happened, but the court disagrees. While the video

28  evidence indeed captures much of what happened, it does not, in the court's opinion, definitively

UNITED STATES DISTRICT COURT
For the Northern District of California

1  show whether Mr. Branscum started the struggle or to what extent he resisted (as Defendants argue),

2  or whether he did not resist and instead was pulled up off the ground by Officer Stephens and

3  punished for the police chase (as Mr. Branscum argues).[13]  In light of the video evidence (and the

4  other evidence submitted by the parties), the court believes that there is sufficient evidence for a

5  reasonable jury to return a verdict for either party.  Accordingly, the parties' motions for summary

6  judgment on Mr. Branscum's first claim are **DENIED**.  *See Burns v. City of Redwood City*, No. C

7  08-2995 RS, 2010 WL 3340552, at *8 (N.D. Cal. Aug.25, 2010) ("Because an excessive force claim

8  'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences

9  therefrom,' the Ninth Circuit has also instructed that summary judgment in excessive force cases

10  should be granted sparingly.") (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

11  **IV.  QUALIFIED IMMUNITY**

12      Defendants assert that even if the Officer Defendants violated Mr. Branscum's Fourth

13  Amendment right by using excessive force to restrain and arrest him, they are entitled to qualified

14  immunity.  "The doctrine of qualified immunity protects government officials 'from liability for

15  civil damages insofar as their conduct does not violate clearly established statutory or constitutional

16  rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231

17  (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances

18  two important interests—the need to hold public officials accountable when they exercise power

19  irresponsibly and the need to shield officials from harassment, distraction, and liability when they

20  perform their duties reasonably."  *Id.*  "The protection of qualified immunity applies regardless of

21  whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on

22  mixed questions of law and fact.'"  *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)

23  (Kennedy, J., dissenting)).

24      In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court "mandated a two-step sequence for

25  resolving government officials' qualified immunity claims."  *Id.* at 232.  "First, a court must decide

26

27  ───────────────

28      [13] There also is accompanying audio evidence—someone yelling at someone else, "you
fucking asshole"—that a factfinder could reasonably believe supports Mr. Branscum's theory that he
did not start the struggle and was actually being punished for the police chase.

whether the facts that a plaintiff has alleged (see Fed. Rules Civ. Proc. 12(b)(6), (c)) or shown (see Rules 50, 56) make out a violation of a constitutional right." *Id.* (citing *Saucier*, 533 U.S. at 201). This part of the inquiry "mirrors the substantive summary judgment decision on the merits." *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). "If no constitutional right would have been violated were the allegations established," then the officer is entitled to qualified immunity. *Saucier*, 533 U.S. at 201. "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).[14]

As noted above, the court believes that material issues of fact exist regarding whether the Officer Defendants used objectively reasonable force to restrain and arrest Mr. Branscum.   So for purposes of immunity, Mr. Branscum's constitutional rights may have been violated, and the second part of the inquiry must be conducted.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *see also Walker v. Gomez*, 370 F.3d 969, 978 (9th Cir. 2004). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

It is clearly established that an individual has a right to be free from excessive force and that "force is only justified when there is a need for force," *Blankenhorn v. City of Orange*, 485 F.3d

---

[14] The Supreme Court has stated that the order in which these questions are addressed is left to the lower court's discretion. *Pearson*, 555 U.S. at 236 ("[W]hile the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").  That said, the Supreme Court also believes that the order used in *Saucier* "is often beneficial."  *Id.*

463, 481 (9th Cir. 2007), so now the inquiry is whether it would be clearly established that the degree of force used here would violate an individual's Fourth Amendment right. As described above, there is a genuine issue of a material fact—whether Mr. Branscum resisted at all and, if so, to what extent he resisted, and whether he started the struggle or was pulled up by Officer Stephens. Until this key fact issue is resolved, based on the evidence presented, the court cannot decide as a matter of law whether the amount of force used was reasonable. The court also cannot decide as a matter of law whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," because it is unclear what the situation was.

In short, the court cannot rule at this time whether the Officer Defendants are shielded from liability for civil damages under the doctrine of qualified immunity. Accordingly, the court **DENIES** the parties' motions for summary judgment on the issue of qualified immunity. *See Santos*, 287 F.3d at 855 n.12 (9th Cir. 2002) (noting that it was "premature" to decide whether qualified immunity shielded officers from a excessive force claims "because whether the officers may be said to have made a 'reasonable mistake' of fact or law [ ] may depend on the jury's resolution of disputed facts and the inferences it draws therefrom"; "Until the jury makes those decisions, we cannot know, for example, how much force was used, and, thus, whether a reasonable officer could have mistakenly believed that the use of that degree of force was lawful."); *Burns*, 2010 WL 3340552, at *12 ("Just as the question of whether a constitutional violation occurred here turns entirely on whose facts to accept, so too does the question of immunity. More simply, if [plaintiff] behaved as the officers contend, their mistake of fact might be objectively reasonable. If he did not, the mistake may be deemed unreasonable.").

## V. MR. BRANSCUM'S CLAIM UNDER *MONELL*

Mr. Branscum asserts that the City and Chief Holder failed to properly train, supervise, investigate, or discipline the Officer Defendants, ratified their acts, and demonstrated a deliberative indifference to a policy and practice of ignoring excessive force, and thus they are liable for the officers' actions under *Monell*.

Local governments are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort. *See Monell*, 436 U.S. at 690. However, a city or

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   county may not be held vicariously liable for the unconstitutional acts of its employees under the

2   theory of *respondeat superior.  See Board of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997);

3   *Monell*, 436 U.S. at 691; *Fuller v. City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995).  To impose

4   municipal liability under § 1983 for a violation of constitutional rights, a plaintiff must show: (1)

5   that the plaintiff possessed a constitutional right of which he or she was deprived; (2) that the

6   municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's

7   constitutional rights; and (4) that the policy is the moving force behind the constitutional violation.

8   *See Plumeau v. School Dist. # 40 County of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

9       Liability based on a municipal policy may be satisfied in one of three ways: (1) by alleging and

10  showing that a city or county employee committed the alleged constitutional violation under a

11  formal governmental policy or longstanding practice or custom that is the customary operating

12  procedure of the local government entity; (2) by establishing that the individual who committed the

13  constitutional tort was an official with final policymaking authority, and that the challenged action

14  itself was an act of official governmental policy which was the result of a deliberate choice made

15  from among various alternatives; or (3) by proving that an official with final policymaking authority

16  either delegated policymaking authority to a subordinate or ratified a subordinate's unconstitutional

17  decision or action and the basis for it.  *See Fuller*, 47 F.3d at 1534; *Gillette v. Delmore*, 979 F.2d

18  1342, 1346-47 (9th Cir. 1992).

19      Here, Branscum's *Monell*-based liability claim against the City is based on the City's failure to

20  properly train the Officer Defendants about how to distinguish between different levels of resistance

21  and how to apply reasonable amounts of force to them, on Chief Holder's failure to discipline the

22  Officer Defendants, and on the City's use of the video recordings of Mr. Branscum's arrest to train

23  officers how to conduct an arrest in similar situations.

24      First, as explained above, the court cannot rule as a matter of law that a Constitutional violation

25  did not occur, so the court cannot grant summary judgment for the City for this reason, as

26  Defendants argue.  *See* Defendants' Motion, ECF No. 42 at 39; Reply, ECF No. 52 at 14.[15]

27  _____

28      [15] Although Defendants are correct that if no Constitutional violation occurred, the City and
    Chief Holder would not be liable under *Monell*.  *Long v. City and County of Honolulu*, 511 F.3d

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Second, the court finds that there are genuine issues of material fact regarding whether the City

2    failed to properly train its officers regarding different levels of resistance.  Inadequate police training

3    is a basis for liability under section 1983 if the following factors are established:  (1) the training is

4    inadequate for the tasks that police officers perform; (2) the failure to train amounts to deliberate

5    indifference to the rights of persons like the plaintiff who come into contact with the police; and (3)

6    the inadequate training actually caused the constitutional injury.  *See City of Canton v. Harris*, 489

7    U.S. 379, 388-89 (1989); *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989).  That

8    happens when the municipality makes a deliberate, conscious choice, and the resulting deficient

9    training has a direct, causal link to the deprivation of federal rights.  *See City of Canton*, 489 U.S. at

10   388.  "[D]eliberate indifference to a person's constitutional rights occurs when the need for more or

11   different action, 'is so obvious, and the inadequacy [of the current procedure] so likely to result in

12   the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been

13   deliberately indifferent to the need."  *Lee v. City of Los Angeles*, 250 F.3d 668, 682 (9th Cir. 2001).

14   As Mr. Branscum points out, while the City's policy manual does provide factors for determining

15   the reasonableness of the force to be used during an arrest, Mr. Branscum presents admissible

16   evidence that suggests that the Officer Defendants were not trained regarding the difference between

17   active and passive resistance and about what level of force may reasonably be applied to arrestees

18   resisting in these ways.  Accordingly, the court cannot find as a matter of law that the City and Chief

19   Holder cannot be liable under this theory at this time.  *See Lee*, 250 F.3d at 682 ("Whether a local

20   government entity has displayed a policy of deliberate indifference is generally a question for the

21   jury.") (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477-78 (9th Cir. 1992)).

22       Third, the court finds that there are genuine issues of material fact regarding whether Chief

23   Holder ratified the Officer Defendants' acts by failing to investigate their acts (and signing off on

24

25

26

_____

27   901, 907 (2007) ("If no constitutional violation occurred, the municipality cannot be held liable and

28   whether 'the departmental regulations might have authorized the use of constitutionally excessive

     force is quite beside the point.'") (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

UNITED STATES DISTRICT COURT
For the Northern District of California

them) and to discipline them for them.[16]  "To show ratification, a plaintiff must prove that the 'authorized policymakers approve a subordinate's decision and the basis for it.'"  *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); citing *Gillette*, 979 F.2d at 1348 (refusing to find ratification, because "[t]here is no evidence that the City manager made a deliberate choice to endorse the Fire Chief's decision and the basis for it")).  Mr. Branscum has done so.  While "it is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval," *Christie*, 176 F.3d at 1239-40 (citations omitted), Mr. Branscum presents admissible evidence showing that Chief Holder did more than that.  As described above, Chief Holder is the ultimate policy-maker for the SRPD, and he signed off on the use of force upon Mr. Branscum after reviewing the video and reading the incident report.  Lagos Declaration, ECF No. 51-3, Ex. I at 25:9-27:2.  This is more than simply having knowledge of the events and refusing to do anything about them.  In addition, the videos, or portions of them, have been used by the SRPD as part of its training of officers.  *Id*., Ex. N at 31:17-34:12.  Thus, the court finds that a reasonable factfinder could conclude that the City and Chief Holder affirmatively approved of the Officer Defendants' alleged use of excessive force.

Accordingly,  the parties' motions for summary judgment on Mr. Branscum's *Monell* claim is **DENIED**.

### CONCLUSION

For the foregoing reasons, the court **DENIES** Defendants' and Mr. Branscum's motions for summary judgment.

**IT IS SO ORDERED.**

Dated: December 21, 2012

_____
LAUREL BEELER
United States Magistrate Judge

---

[16] "Ordinarily, ratification is a question for the jury."  *Christie v. Iopa*, 176 F.3d 1231, 1238-39 (9th Cir. 1999) (citing *Fuller*, 47 F.3d 1522, 1534 (9th Cir. 1995)).  "However, as with any jury question, a plaintiff must establish that there is a genuine issue of material fact regarding whether a ratification occurred."  *Id*. at 1239 (citing *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir.), as amended, 125 F.3d 1281 (9th Cir. 1997)).